**LIBERTY SURPLUS INSURANCE CORPORATION, Plaintiff–Appellant–Cross–Appellee,**

v.

**THE SEGAL COMPANY, Defendant-Counter-Claimant-Counter-Defendant-Appellee-Cross-Appellant.**

**Docket Nos. 04–5562CV, 04–6005CV.**

United States Court of Appeals, Second Circuit.

Aug. 9, 2005.

512

Jonathan Bruno, Kaufman Borgest & Ryan LLP (A. Michael Furman, on the brief; Terry D. Weissman, Christopher D. Mickus, Neal, Gerber & Eisenberg LLP, Chicago, Ill.), New York, NY, for Appellant, of counsel.

Randy Paar, Dickstein Shapiro Morin & Oshinsky, LLP (John P. Winsbro, Andrew N. Bourne), New York, NY, for Appellee, of counsel.

PRESENT: STRAUB, SACK, Circuit Judges, and KRAVITZ, District Judge.*

## SUMMARY ORDER

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, at Foley Square, in the City of New York, on the 9th day of August, two thousand five.

AFTER ARGUMENT AND UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment is AFFIRMED with respect to Segal's counterclaim for declaratory relief.

## INTRODUCTION

This appeal arises out of a second-layer excess insurance policy provided by Liberty Surplus Insurance Corporation ("Liberty") to The Segal Company ("Segal") for the policy period of June 14, 2001 through

* The Honorable Mark R. Kravitz, of the United States District Court for the District of Connecticut, sitting by designation.

June 14, 2002. Liberty filed suit in the United States District Court for the Southern District of New York (Barbara S. Jones, *Judge*) for a declaratory judgment that it owes no duty to provide excess coverage for any liability against Segal arising out of a suit brought by Suffolk County. Segal filed a counterclaim for a declaratory judgment that Liberty has such a duty; Segal also brought claims for breach of contract, fraud, and attorneys' fees incurred in defending Liberty's action. Segal filed a motion for summary judgment on its claims pursuant to Federal Rule of Civil Procedure 56, and Liberty filed a motion pursuant to Rule 12(b)(6) to dismiss Segal's counterclaims except for the claim for declaratory judgment.

The essence of the dispute is whether claims filed by Suffolk County against Segal on October 24, 2002 fall within the scope of an Extended Reporting Period Endorsement ("ERP") added to the policy issued by Liberty (the "Liberty Policy"). By Memorandum Order dated September 19, 2004, the District Court found the ERP unambiguous and held that the Suffolk County claims fall within the ERP and are covered by the Liberty Policy. The court thus granted summary judgment in favor of Segal on its claim for declaratory judgment. The District Court, however, granted Liberty's Rule 12(b)(6) motion, dismissing without prejudice Segal's claim for breach of contract, and dismissing with prejudice Segal's claims for fraud and for attorneys' fees.

Liberty timely appealed the grant of summary judgment in favor of Segal. Segal has filed a cross-appeal to challenge the dismissal of its claim for attorneys' fees. In this summary order, we address only Liberty's appeal concerning the interpretation of the ERP and affirm the District Court's entry of summary judgment in favor of Segal. In a *per curiam* opinion

filed concurrently with this summary order, we address Segal's cross-appeal and whether Segal, having prevailed in the dispute over coverage, is entitled to attorneys' fees.

## DISCUSSION

We review *de novo* the District Court's grant of Segal's motion for summary judgment. *Sharpe v. Conole*, 386 F.3d 482, 483–84 (2d Cir.2004), *cert. denied*, —— U.S. ——, 125 S.Ct. 2516, 161 L.Ed.2d 1109 (2005). We further review *de novo* the District Court's determination that the ERP is unambiguous and its interpretation of the ERP in connection with the Liberty Policy. *See Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, N.J.*, 160 F.3d 124, 128 (2d Cir.1998). In this case, there are no disputed issues of fact, except to the extent that Liberty contends that the ERP is ambiguous and raises an issue of fact concerning the intent of the parties. There is also no dispute that New York law applies in this action.

"Under New York law, an insurance policy is a contract that is construed to effectuate the intent of the parties as expressed by their words and purposes." *Dicola v. Am. Steamship Owners Mut. Protection & Indem. Ass'n (In re Prudential Lines Inc.)*, 158 F.3d 65, 77 (2d Cir.1998). Unambiguous terms are given their plain and ordinary meaning, but provisions will be found ambiguous if they are "reasonably susceptible to more than one reading." *Id.* (internal quotations omitted). Whether an insurance policy is ambiguous is an issue of law for the court, but where a policy is ambiguous, extrinsic evidence may be introduced and credibility determinations involving that evidence will generally present an issue for the trier of fact. *Id.*

In this case, the dispute is over Endorsement No. 4, the ERP, issued by Liberty on June 17, 2002, after it had in-

formed Segal that it would not renew the policy for an additional year.[1] The ERP was issued in exchange for $495,000 in consideration and provided:

> 1. This Policy, subject to its remaining Aggregate Limit of Liability, is hereby extended to apply to Claims first made against the Insured during thirty-six (36) calendar months immediately following June 30, 2002, which is the effective date of non-renewal of this Policy. This thirty-six month interval is referred to as the Extended Reporting Period.
> 2. The Extended Reporting Period ... shall apply only to Claims which arise out of any act, error, or omission of the Insured prior to June 30, 2002 and which would otherwise be covered hereunder.

The ERP further provided: "All other terms and conditions of this Policy remain unchanged."

There is no dispute that the Suffolk County action was filed on October 24, 2002, within the extended reporting period, and that the action is based in part on acts or omissions by Segal occurring from June 14, 2001, to June 30, 2002. It is also clear that the Suffolk County claims will be covered by the "Underlying Policies" identified in the Liberty Policy Declarations: the primary policy, No. 9624 948, and the first-layer excess policy, No. 9624 949. Both "Underlying Policies" were issued by Certain Underwriters at Lloyd's of London ("Lloyd's") and were attached to the Liberty Policy, and the Underlying Policies on their face clearly provided Segal with coverage from April 15, 2000, to April 15, 2003.

Liberty, however, contends that the ERP only extends coverage for claims that "would otherwise be covered" under the Liberty Policy, and points out that the Declarations in the Liberty Policy identified the Underlying Policies' "policy period" as June 14, 2001, to June 14, 2002. In Liberty's view, the Declarations mean that Liberty's duty to provide coverage only arises where the Underlying Limits of Liability for the period of June 14, 2001, to June 14, 2002 have been exhausted.[2] Because the Underlying Policies were both claims-made policies, and because the Suffolk County claims were made in October 2002, the Suffolk County claims will not apply to the annual limits of liability in the Lloyd's policies for the June 14, 2001, to June 14, 2002, period. Liberty thus contends that the Underlying Policies, as identified in the Declarations, will never be exhausted by claims made after June 14, 2002, and that the ERP will never require Liberty to provide excess coverage for such claims. Instead, Liberty interprets the ERP as only providing an extended period for Segal to report to Liberty claims first made against Segal during the initial policy period of June 14, 2001, to June 14, 2002.

As an initial matter, the interpretation of the ERP advanced in Liberty's appellate briefs is contrary to the ERP's plain language. The ERP, in pertinent part,

---

1. The Liberty Policy was initially issued to cover the policy period of June 14, 2001, through June 14, 2002. On or about May 30, 2002, Liberty advised Segal that it would not renew the excess policy for an additional year. On June 17, 2002—the same day as the issuance of the ERP—Liberty issued Endorsement No. 3, which extended the policy expiration date to June 30, 2002, in exchange for additional consideration.

2. The Lloyd's policies each provided an "annual aggregate" limit of liability of $5 million for each of the three successive years beginning in April 15, 2000. After certain amendments to the Lloyd's policies, June 14, 2001, to June 14, 2002, became one of the policy years for calculating the annual aggregate limit of liability within each Lloyd's policy.

provides that the Liberty Policy is "extended to apply to *Claims first made* against the Insured during the thirty-six (36) calendar months immediately following June 30, 2002." This language clearly indicates an intent to provide excess coverage for claims made after June 30, 2002. Moreover, by referring to claims "first made" after June 30, 2002, the ERP cannot possibly be read, as Liberty suggests, to allow Segal to make late reports for claims made before June 30, 2002.

While there is a tension between the ERP and the Liberty Policy Declarations, it is axiomatic that "particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary." *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.,* 717 F.2d 664, 669 n. 8 (2d Cir.1983); *see also Muzak Corp. v. Hotel Taft Corp.,* 1 N.Y.2d 42, 46–47, 133 N.E.2d 688, 690, 150 N.Y.S.2d 171, 174 (1956) (holding that a specific provision continuing the licensing fee for equipment subject to a modification agreement controlled over the general termination provision in the original contract). The ERP clearly extends Liberty's excess coverage to "Claims first made against the Insured" after June 30, 2002, and clearly does not provide an extended reporting period for claims first made prior to June 30, 2002. Enforcing the "policy period" identified in the Declarations strictly, as Liberty asks us to do, would mean that Liberty would *never* have to provide coverage for "Claims first made against the Insured" after June 30, 2002. That is, if we accept Liberty's argument, the ERP would be meaningless and Segal

paid $495,000 for a worthless endorsement. Consistent with the traditional canons of contractual interpretation, we reject a construction of the agreements that would render the ERP meaningless, and, to the extent that the ERP potentially conflicts with the Declarations, the plain language of the ERP is controlling. *See* Restatement (Second) of Contracts § 203.[3]

Moreover, we do not read the "policy period" stated in the Declarations as indicating a substantive limit on coverage or as defining the duty to exhaust; instead the Declarations indicated generally that the Liberty Policy would run coextensively with a certain portion of the Underlying Policies. That is, the Liberty Policy, as initially issued, provided excess coverage for a defined period, subject to the exhaustion of the Underlying Policies' limits of liability for that same period. To the extent that the ERP extended the Liberty Policy and plainly expresses an intent to cover claims first made after June 30, 2002, it necessarily extended the period for Segal to exhaust coverage under the Underlying Policies.

This reconciliation of the ERP with the Liberty Policy Declarations fulfills the reasonable expectations of the parties as expressed in their agreements. Segal paid substantial consideration to obtain the ERP and second-layer excess coverage for claims first made after June 30, 2002. It was clear to all parties entering into the ERP that the Underlying Policies—Nos. 9624 948 and 9624 949—had not expired and would continue to provide Segal coverage through April 2003. It was also clear that, under the Lloyd's policies, the com-

---

**3.** At oral argument on appeal, Liberty advanced a new argument that Segal was supposed to obtain from Lloyd's an ERP for the June 2001 to June 2002 period and that obtaining such an ERP from Lloyd's would have provided meaning and value to the Liberty ERP. Aside from the fact that Liberty, at least in its appellate briefs, never raised this argument, the argument makes little sense. Segal had coverage from Lloyd's through April 2003. So there would have been no reason or contractual basis for Segal, in June 2002, to seek an ERP from Lloyd's for the June 2001 to June 2002 period.

**516**

bined limit of liability would continue be $10 million annually—the same amount identified in the Declarations. Thus Liberty still will be responsible only for acts occurring from June 2001 to June 2002, it will not be required to provide any payment until a combined $10 million in coverage under the Underlying Policies is exhausted, and the limits of liability for the Liberty Policy remain in tact.

In sum, the only reasonable reading of the ERP in connection with the Liberty Policy results in the conclusion that Liberty is obligated to provide excess coverage for liability resulting from the Suffolk County claims, so long as the limits of liability applicable under the Lloyd's policies are exhausted. Although there is some tension between the ERP and the Liberty Policy Declarations, Liberty cannot offer a reasonable counter-interpretation of the agreements. Liberty's interpretation of the ERP conflicts with its plain language, and Liberty's attempt to enforce the Declarations strictly would render the ERP worthless. Because the ERP, in light of the Liberty Policy as a whole, is not reasonably susceptible to different readings, there is no ambiguity, and the District Court correctly declined to consider Liberty's extrinsic evidence.

### CONCLUSION

For the foregoing reasons, the judgment of the District Court with respect to Segal's counterclaim for declaratory relief is AFFIRMED.