12-2322-bk (L)
Barclays Capital, Inc. v. Giddens

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued:  May 29, 2013                    Decided: August 5, 2014)

Docket Nos. 12-2322-bk(L), 12-2933-bk(XAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

IN RE: LEHMAN BROTHERS HOLDINGS INC.,

        Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BARCLAYS CAPITAL INC., BARCLAYS BANK PLC,

        Appellees-Cross-Apellants,

                v.

JAMES W. GIDDENS, as Trustee for the SIPA Liquidation of Lehman
Brothers Inc.,

        Appellant-Cross-Appellee,

                and

SECURITIES AND EXCHANGE COMMISSION, SECURITIES INVESTOR
PROTECTION CORPORATION, Statutory Intervenors pursuant to
Securities Investor Protection Act, 15 U.S.C. § 78eee(c)&(d),

        Intervenors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, HALL, and LYNCH, Circuit Judges.

1

Appeal from an order entered in the United States District Court for the Southern District of New York (Katherine B. Forrest, Judge), reversing in part and affirming in part an order of the bankruptcy court (James M. Peck, Judge). The trustee of a liquidating broker-dealer and the purchaser of the distressed company's assets dispute the entitlement to certain assets. We affirm the district court.

WILLIAM R. MAGUIRE (Seth D. Rothman, Neil J. Oxford, Samuel C. McCoubrey, Hughes Hubbard & Reed LLP, New York, NY, William R. Stein, Hughes Hubbard & Reed LLP, Washington, DC, Kenneth E. Lee & Scott B. Klugman, Levine Lee LLP, New York, NY, on the brief) Hughes Hubbard & Reed LLP, New York, NY, for Appellant-Cross-Appellee.

KENNETH J. CAPUTO (Josephine Wang, on the brief) Securities Investor Protection Corporation, Washington, DC, for Intervenor Securities Investor Protection Corporation.

DAVID BOIES (Jonathan D. Schiller, Boies, Schiller & Flexner LLP, New York, NY, Hamish P.M. Hume & Jonathan M. Shaw, Boies, Schiller & Flexner LLP, Washington, DC, on the brief) Boies, Schiller & Flexner LLP, New York, NY, for Appellees-Cross-Appellants.

Michael A. Conley, Jacob H. Stillman, Tracey A. Hardin, Benjamin M. Vetter, Securities and Exchange Commission, Washington, DC, for Intervenor Securities and Exchange Commission.

Sigmund S. Wissner-Gross, Brown Rudnick LLP, New York, NY, Steven D. Pohl, Brown Rudnick LLP, Boston, MA, for Amicus Curiae Managed Funds Association.

WINTER, Circuit Judge:

Appellant James W. Giddens is the Trustee appointed pursuant to the Securities Investor Protection Act ("SIPA") to protect public customers and creditors in the liquidation of Lehman Brothers, Inc. ("LBI"). This appeal involves a dispute between the Trustee and the appellee purchasers of LBI's assets over the entitlement to two sets of LBI assets: (i) the "Margin Assets," i.e., cash and cash equivalents held by third parties to secure LBI's exchange-traded derivatives ("ETDs") business; and (ii) the "Clearance Box Assets" (sometimes "CBAs"), about $1.9 billion in unencumbered securities held in LBI's "clearance box" at the Depository Trust Clearing Corporation ("DTCC"). A third dispute, involved in the cross-appeal but now settled, was over the so-called "Rule 15c-3 Assets."[1]

Bankruptcy Judge Peck held that Barclays had not purchased either the Margin Assets or the Rule 15c-3 Assets, but was conditionally entitled to the Clearance Box Assets. On appeal to the district court, Judge Forrest affirmed in part and reversed in part, holding that Barclays was entitled to both the Margin Assets and the CBAs, and was conditionally entitled to the Rule 15c3-3 Assets. The Trustee appealed from the Margin Assets and

---

[1] These were assets either held in LBI's Reserve Bank Account pursuant to Securities and Exchange Commission ("SEC") Rule 15c3-3, 17 C.F.R. § 240.15c3-3(e)(1), or included by LBI as a debit item in calculating the amount required to be held in the Reserve Bank Account pursuant to Rule 15c3-3.

CBA rulings.[2] Barclays cross-appealed from the Rule 15c3-3 Assets ruling but the settlement has disposed of that issue and cross-appeal.

For the reasons that follow, we affirm the district court.

BACKGROUND

We relate here only those facts pertinent to the disposition of the issues before us. Certain documents and asset-specific facts are considered more fully in the Discussion section, infra.

a) The Lehman Bankruptcy

On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI" and together with LBI, "Lehman") filed for bankruptcy. The SIPA liquidation of LBI, LBHI's North American broker-dealer subsidiary, followed.

Both government regulators and Lehman alike desired, and achieved, an emergency sale of LBI to Barclays Capital Inc. ("Barclays") pursuant to Section 363 of the Bankruptcy Code, 11 U.S.C. § 363 (the "Sale" or "Asset Sale"). The Sale was the "largest, most expedited and probably the most dramatic asset sale that has ever occurred in bankruptcy history . . . ." In re Lehman Bros. Holding Inc., 445 B.R. 143, 148-49 (Bankr. S.D.N.Y. 2011). The sale of Lehman's businesses as a going concern saved

_____

[2] The Trustee's position regarding the Margin Assets is adopted by the Securities Investor Protection Corporation ("SIPC"), "a statutorily created nonprofit corporation consisting of registered broker-dealers and members of national securities exchanges . . . ." In Re Bernard L. Madoff Inv. Secs. LLC, 721 F.3d 54, 58 (2d Cir. 2013), cert. denied, No. 13-448, 2014 WL 2921722 (U.S. June 30, 2014). Both SIPC and the SEC are authorized to participate in SIPA proceedings. See 15 U.S.C. § 78eee(c)-(d).

thousands of jobs and avoided losses estimated to be in "the hundreds of billions of dollars."

The Sale was also understood as a tremendous risk for Barclays. However, as the bankruptcy court later stated, "the overall transaction with Barclays . . . provided the means for the most favorable disposition of these assets with the least amount of risk." Id. at 157. It was the best, and perhaps the only, alternative to a huge economic loss.

On September 16, 2008, the day after the bankruptcy filing, Lehman and Barclays executed an Asset Purchase Agreement ("APA"), that defined the assets that would be "Purchased" by Barclays and those that would be "Excluded" from that purchase. The assets that were to be "Purchased" under the APA included, among other things, retained cash, all deposits and prepaid charges and expenses, and "exchange traded derivatives." The assets that were to be "Excluded" from the "Purchase" were set forth in Section 1.1 of the APA, and encompassed "all cash, cash equivalents, bank deposits or similar cash items of LBI," as well as "all assets primarily related to . . . derivative contracts."

Although unknown to the bankruptcy court at the time, Barclays's board of directors was prepared to approve the deal only if it was "capital accretive," i.e., included a buffer of assets in excess of liabilities in the amount of $5 million. The parties agreed to achieve such a buffer by means of a repurchase agreement. On September 18, the day before the bankruptcy court

was to hold the "Sale Hearing" to consider the Asset Sale, Barclays provided LBI with $45 billion in cash so that LBI could repay a loan it had received from the New York Federal Reserve. In exchange, LBI was expected to provide Barclays with collateral previously pledged to the New York Federal Reserve. However, the collateral LBI transferred was worth far less than $45 billion.

In addition, LBI notified Barclays on the morning of September 19, the day of the Sale Hearing, that it could no longer deliver billions of dollars in assets that had been promised in the APA. As a result, Barclays demanded that LBI identify assets that LBI could still transfer, in order for Barclays to decide whether to close the deal. The bankruptcy court dubbed what ensued thereafter as the "asset scramble," in which LBI sought to identify assets that could be transferred to Barclays in order to close the deal. 445 B.R. at 151. This scramble produced the two groups of assets that are the subject of the current appeal: the Margin Assets and the CBAs.[3]

At the Sale Hearing later that day, the parties represented that a deal had been reached in principle but that there were still several moving parts. The Sale involved, inter alia, the transfer of financial assets, liabilities, and 72,000 customer accounts. It was presented in the form of the APA. Because LBI

---

[3] Barclays contends that all the disputed assets here were already part of the APA, but that these assets needed to be specifically identified by LBI only to allow Barclays to assess their value.

was unable to deliver assets previously promised to Barclays in the APA, however, amendments and clarifications to the APA were required.

A relevant change discussed at the Sale Hearing related to the treatment of "cash." The APA had initially provided that Barclays would acquire $1.3 billion in "retained cash," and excluded cash in excess of that amount. That amount was later reduced to $700 million and was completely eliminated from the Sale by the date of the Sale Hearing. It was made clear at the Sale Hearing that no "cash" from Lehman would be transferred to Barclays.

Counsel for Barclays represented at the Sale Hearing that all material changes had been disclosed. The bankruptcy court admonished that any change to the deal in excess of $500 million would be material. Given the urgency caused by the economic crisis and the lack of time for ordinary negotiation and drafting, Lehman, the bankruptcy court, the Trustee, Barclays, the Securities Investor Protection Corporation ("SIPC"), and the government all supported the Sale despite the lack of complete documentation regarding the assets to be transferred. The parties told the court that a "Clarification Letter" would be forthcoming, memorializing any necessary changes.

After the Sale Hearing, the bankruptcy court entered an order (the "Sale Order"), approving the transaction as presented at the Sale Hearing. The Sale Order approved "the Asset Purchase Agreement, as modified, clarified, and/or amended by the First

7

Amendment, and a letter agreement, dated as of September 20, 2008, clarifying and supplementing the [APA]." 445 B.R. at 190. "Given the many moving parts, the complexity of the acquisition, and the extreme time pressure, the [bankruptcy court] knew that the Sale Order needed to be flexible enough to accommodate changes to the APA. This concept was reflected in the Sale Order, which contemplated final documentation materially consistent with its terms." 445 B.R. at 188-89. In that vein, the Sale Order "authorized and directed" the parties to "take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement."

Over the weekend, the parties crafted the Clarification Letter ("CL"), which was intended to record changes to the APA consistent with representations made at the Sale Hearing. The CL revised portions of the definitions of Purchased and Excluded Assets. On Monday morning, September 22, the letter was filed with the bankruptcy court, "giving broad notice of its terms." 445 B.R. at 162. The letter was also served on all interested parties who had appeared in the case. The parties, however, did not seek court approval of the CL, representing that it did not alter the APA but only documented changes discussed at the Sale Hearing. The deal formally closed later that morning. Id. at 161.

For nearly a year, both Barclays and the Trustee relied on the CL, referencing its validity while jointly, and successfully,

8

defending an appeal of the Sale Order.  Then, however, the parties returned to the bankruptcy court:  Barclays moved for delivery of certain assets it claimed; at the same time, the Trustee, LBHI, and the Official Committee of Unsecured Creditors brought adversary proceedings and motions pursuant to Fed. R. Civ. P. 60(b), seeking relief from the Sale Order (specifically regarding the transfer of the Margin Assets to Barclays).  445 B.R. at 148, 150.  These motions led to a 34-day trial in the bankruptcy court.

b)  <u>Bankruptcy and District Court Opinions</u>

On February 22, 2011, the bankruptcy court issued its decision, followed by a final judgment in July 2011, which:  (i) awarded the Margin Assets to the Trustee (with prejudgment interest); (ii) awarded the CBAs to Barclays; and (iii) found Barclays's claim to the Rule 15c3-3 Assets contingent upon the Trustee having sufficient customer property to satisfy all allowed customer claims filed in the SIPA liquidation.

Each party appealed to the district court:  Barclays with respect to the Margin Assets and the Rule 15c3-3 Assets, and the Trustee with respect to the CBAs.  On July 16, 2012, the district court:  (i) reversed the bankruptcy court and awarded Barclays the Margin Assets; (ii) affirmed that Barclays was entitled to the CBAs; and (iii) affirmed that Barclays did not have an unconditional right to the Rule 15c3-3 Assets.  An appeal and cross-appeal followed, but, as noted above, the cross-appeal

9

relating to the Rule 15c3-3 Assets has been settled. We thus consider the Trustee's appeal as to the Margin Assets and CBAs.

DISCUSSION

We review bankruptcy court orders that have been appealed to the district court "independently." In re CBI Holding Co., 529 F.3d 432, 448-49 (2d Cir. 2008). The bankruptcy court's "legal conclusions are reviewed de novo," and its "factual conclusions are reviewed for clear error." Id. at 449. Additionally, we may affirm on any ground that finds support in the record. McElwee v. County of Orange, 700 F.3d 635, 640 (2d Cir. 2012).

The issues before us involve New York contract law. Therefore, "the intention of the parties should control, and the best evidence of intent is the contract itself." Cont'l Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir. 2010) (internal quotation marks and alterations omitted). After giving all the terms of a contract "their plain meaning," Olin Corp. v. Am. Home Assurance Co., 704 F.3d 89, 99 (2d Cir. 2012), we determine whether language in a contract is ambiguous, see Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011). Ambiguity exists only if a contract term "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Id. Where contractual language is ambiguous, a court may consider extrinsic evidence of the parties' intent. Roberts v. Consol. Rail Corp., 893 F.2d 21, 24 (2d Cir. 1989).

10

a) <u>The Margin Assets</u>

    1) Facts

The Margin Assets consist of approximately $4 billion that had been maintained by LBI in accounts at various financial institutions as collateral in connection with its exchange-traded derivative ("ETD") business. The assets in dispute were LBI property and pledged by LBI to support its own and customer trading. The ETD business included all of LBI's ETD positions, such as exchange-traded options and futures. To protect against default, clearinghouses and carrying brokers through which ETDs are settled require account owners to pledge margin collateral to secure ETD obligations. The positions consisted of rights with potential value but also potential losses when they included an obligation to buy or sell assets at a pre-determined price in the future. It is undisputed that Barclays purchased LBI's ETD business. The dispute is over whether the Margin Assets supporting the ETD business, in the form of cash or cash equivalents, were transferred along with the ETD business by operation of the various documents at issue.

    2) Relevant Contractual Provisions

Several contractual provisions are relevant to the Margin Assets. As noted, the APA defines "Purchased" and "Excluded" assets. The ETD business is listed as a "Purchased Asset" under the APA. The APA provides further that Barclays would acquire "all of the assets" that were "used in connection with the Business (excluding the Excluded Assets)." Additionally, the APA

11

contains a seller warranty stating that "all of the necessary assets and services used by Seller and its Affiliates to operate the Business as it is currently operated" would be transferred.

Section 2.2 of the APA provided: "Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Seller (directly and indirectly) shall retain all right, title and interest to, in and under the Excluded Assets." Excluded Assets, as defined in the APA, included "all cash, cash equivalents, bank deposits, or similar cash items of LBI and its Subsidiaries (the "Retained Cash") other than $1.3 billion in cash, cash equivalents, bank deposits, or similar cash items." Further, "Exclusion (n)" excluded the transfer of "assets primarily related to the [Investment Management Business] and derivatives contracts." The term "derivatives contracts" was not specially defined in the APA; nor was the term "exchange-traded derivatives."

Section 1(a) of the CL clarified the definition of "Purchased Assets" as "all of the assets of Seller used primarily in the Business or necessary for the operation of the Business (in each case, excluding the excluded assets)." The CL also provided more detail regarding specific assets that were included as "Purchased Assets," including "exchange-traded derivatives (and any property that may be held to secure obligations under such derivatives) . . . ."

Section 1(c) of the CL revised the APA's definition of "Excluded Assets." It eliminated subsection (b), pertaining to

12

the exclusion of "<u>Retained Cash</u> other than $ 1.3 billion in cash, cash equivalents, bank deposits or similar cash items."  That Section further provided:  "Except as otherwise specified in the definition of 'Purchased Assets,' 'Excluded Assets' shall include any cash, cash equivalents, bank deposits or similar cash items of Seller and its Subsidiaries."  In addition to eliminating Exclusion (b), the Section carried over Exclusion (n), which pertained to "all assets primarily related to . . . derivatives contracts."

3)    Bankruptcy and District Court Decisions

The bankruptcy court found that the APA's exclusion of "all assets primarily related to . . . derivatives contracts" and its general exclusion of "cash" exempted the Margin Assets from transfer.  Judge Peck also based his ruling, in part, on his own recollection of the Sale Hearing.

Regarding the CL and provisions pertaining to the Margin Assets, the bankruptcy court first determined that it would treat the CL as "enforceable" because the parties had relied on it for nearly a year, but that the CL would be valid only "to the extent that [its] provisions are not inconsistent with the record of the Sale Hearing and the language of the Sale Order."   The bankruptcy court also found ambiguity in the CL's parenthetical that transferred "any property that may be held to secure obligations under such derivatives [in the ETD business]."  After a review of extrinsic evidence, it found that such "property" did not include the Margin Assets.

13

The district court disagreed, based on the various Agreements' language.  Central to its holding was the conclusion that the bankruptcy court unequivocally approved (post-hoc) the CL in its decision described supra, and that none of the parties appealed that approval.  Thus, the language of the CL controlled, and the "no cash" representations at the Sale Hearing (along with Judge Peck's own understanding of the representations made at that Hearing, and his construal of the CL in accordance with that understanding) were deemed inadmissible extrinsic evidence by the district court.  The district court concluded that, despite Exclusion (n), the CL's parenthetical unambiguously transferred the Margin Assets to Barclays.

4)   Resolution

We begin by noting the urgency under which this deal was executed, as discussed supra.  Ambiguities and loose ends were inevitable.  Indeed, the bankruptcy court admitted the existence of certain aspects of the Sale, potentially significant aspects, of which it was not aware.  Nor could it have been under the circumstances.

While noting these circumstances, we conclude that transfer of the Margin Assets to Barclays was contemplated in the APA and confirmed in the CL.[4]  The inclusion of the Margin Assets in the

---

[4] The Trustee initially contended that $507 million of the Margin Assets was unavailable because it was a debit item used in the calculation of the Rule 15c3-3 Reserve Account.  However, as noted in a September 5, 2013 letter from both parties to this court, the Trustee has abandoned this position in light of the settlement regarding the Rule 15c3-3 Assets.  Our holding thus encompasses the entirety of the Margin Assets, including the $507 million that was previously a matter of additional dispute.

CL is, therefore, not a material change to the APA and we deem the dispute over whether the bankruptcy court approved the CL to be irrelevant.[5]

In the APA, "exchange-traded derivatives" are clearly included in the definition of Purchased Assets. Further, the CL, amending and clarifying the Sale as contemplated in the Sale Order, specifically defined Purchased Assets to include "exchange-traded derivatives" and "any property that may be held to secure obligations under such derivatives." The unambiguous meaning of those terms conveys the Margin Assets to Barclays.

The Trustee claims that exclusions in the APA pertaining to cash and derivatives contracts (Exclusions (b) and (n), respectively) bar the transfer. We disagree.

First, Exclusion (b), pertaining to "cash," explicitly does not apply to those assets that are deemed "Purchased," and the Margin Assets fall under that term's plain meaning in the agreements. We are also not troubled by the "no cash" promises emphasized at the Sale Hearing and recorded in the documents. When used in a general sense, as here, cash means money ready for use. Cash or cash equivalents pledged as a collateral are encumbered and not ready for use. Moreover, it would be highly

---

[5] Holding, as we do, that the transfer to Barclays of the Margin Assets was contemplated in the Sale and was not a material change to the Sale, we need not consider the Trustee's and SIPC's claims that, had the bankruptcy court approved a document that included material changes post hoc, such approval would violate Section 363.

unusual for a buyer to purchase LBI's ETD business in its entirety but not the collateral that allowed that business to exist, particularly in a time of economic crisis when the value of the underlying assets, e.g., options and futures, would be extremely volatile. Indeed, notwithstanding LBI's desperate need for "cash," it did not liquidate the Margin Assets because doing so would have destroyed the ETD business, which it wanted to sell.

If the Margin Assets were not to be conveyed, we would expect a clear expression of such an intent.[6] No doubt, had this issue arisen before or at the Sale Hearing, even clearer language would have been adopted in the APA and CL. The urgency of the moment as well as a fear of ending any prospect of selling the ETD business and perhaps losing the entire sale no doubt

---

[6] Although our holding does not depend on it, there is ample and convincing extrinsic evidence, in particular their post-Sale conduct, that both parties understood that the Margin Assets were included in the Sale. On September 20, the day after the Sale Hearing, in the Transfer and Assumption Agreement ("TAA"), signed by Barclays, the Trustee, and the Options Clearing Corporation ("OCC"), the Trustee, acting on behalf of Lehman, agreed to transfer "all margin deposits held by OCC with respect to [account numbers 74, 84, and 273]." At oral argument before the district court, the parties agreed that the specified numbered accounts contained only Lehman proprietary margin assets, i.e., a significant portion of the Margin Assets involved in this dispute. All signatories warranted that the TAA was "legal, valid and binding."

Also, the Trustee acknowledged and indicated his intent to transfer "substantial proprietary cash" in accordance with the TAA. The OCC also emailed the Trustee regarding "nearly $1 billion in cash" in LBI's OCC accounts that would be transferred to Barclays under the Sale, and the Trustee agreed. Moreover, the Trustee approved the transfer of over $2 billion in proprietary Margin Assets to Barclays following the Sale. The Trustee also responded to inquiries from the OCC and Barclays with multiple acknowledgments of its "inten[t] to comply" with the TAA -- which it understood to involve the transfer of "collateral" -- and its knowledge of Barclays being "the owner" of LBI's former OCC accounts, including all "positions and collateral."

precluded this. Particularly under these circumstances, the language used is sufficient.

Second, to adopt the Trustee's reading of Exclusion (n) and include exchange-traded derivatives and related collateral in the term "derivatives contracts" would conflict with the APA itself, which specifically lists exchange-traded derivatives as a Purchased Asset. We decline to engage in the exertion necessary to create ambiguity and conflict where there is none when the documents are read as a whole. The provisions clearly distinguish the Margin Assets from pure "cash" and exchange-traded derivatives from "derivatives contracts." As noted above, any interpretation that would create such ambiguity and result in the sale of the exchange-traded derivatives without the Margin Assets as collateral is rendered implausible by the commercial unlikelihood of such a deal in the circumstances described.

b) <u>The Clearance Box Assets</u>

The Clearance Box Assets ("CBAs") are "approximately $1.9 billion in unencumbered securities held in LBI's 'clearance box' accounts at [the Depository Trust & Clearing Corporation ("DTCC")]." As the bankruptcy court found, the CBAs provided collateral to secure open trading positions and, in the event of a default by LBI, DTCC could look to the CBAs to cover any potential liability that arose from failed trades. During the weekend prior to closing, negotiations led to two separate agreements that contained provisions arguably governing the

17

transfer of the CBAs. One agreement was set forth in the CL, and the other was set forth in the "DTCC Letter."

First, the CL provided that Purchased Assets include "such securities and other assets held in LBI's 'clearance boxes' as of the time of the Closing, which at the close of business on September 21, 2008 were as specified on Schedule B previously delivered by Seller and accepted by Purchaser." According to Schedule B -- which listed the specific assets to be transferred -- 98 percent of these assets were "in LBI's DTC clearance boxes." In re Lehman, 445 B.R. at 200.

Second, the DTCC Letter, which was executed by the DTCC, the Trustee, and Barclays, provided that "Barclays has indicated, and hereby agrees, that all of the accounts of LBI maintained at the Clearing Agencies Subsidiaries . . . constitute 'Excluded Assets' within the meaning of the APA." On its face, this general language appears to include the CBAs held by LBI at DTCC.

The bankruptcy court found the DTCC Letter to be ambiguous, and thus considered it extrinsic evidence. After weighing that evidence, the bankruptcy court found that it was "the intent of the parties to transfer the Clearance Box Assets to Barclays." 445 B.R. at 201. The district court affirmed. It found ambiguity not in a particular term, but in the fact that the provisions in the agreements conflicted, and agreed that extrinsic evidence showed an intent to transfer the CBAs to Barclays.

18

Our view is as follows. At first reading, the provisions of the CL and the DTCC Letter seem contradictory. The CL provided that the CBAs are Purchased Assets acquired by Barclays, while the DTCC Letter represented that accounts maintained by LBI at the DTCC are Excluded Assets. But, like the bankruptcy court, we find another reading of the DTCC Letter possible. The DTCC Letter -- which does not specifically mention the CBAs -- shows only that Barclays was not acquiring the LBI accounts themselves, but could still receive a grant of assets (for example, the CBAs) from within those accounts.

The DTCC Letter's general reference to "accounts of LBI" does not convey the CBAs unambiguously. The DTCC Accounts contained billions of other assets, including collateral assets in which the DTCC held a security interest. The CBAs, on the other hand, were lien-free assets that were held in lien-free accounts. Selling off the specific assets within the accounts was a matter between Barclays and Lehman, not the DTCC. To the extent that there appears to be conflict between these provisions, the specific governs the general. See, e.g., John Hancock Mut. Life Ins. Co. v. Caroline Power and Light Co., 717 F.2d 664, 669 n.8 (2d Cir. 1983)("[P]articularized contract language takes precedence over expressions of intent that are general . . . ."); accord Liberty Surplus Ins. Corp. v. Segal Co., 142 Fed. App'x 511, 515 (2d Cir. 2005) (summary order).

As the bankruptcy court found, "[t]he unambiguous text of the Clarification Letter contains more detail and is more

19

specific with respect to the Clearance Box Assets than the DTCC Letter." 445 B.R. at 202. That is, "Schedule B to the Clarification Letter specifically identifies individual Clearance Box Assets, whereas the DTCC Letter has no similar itemized list of securities." Id.

The Trustee's argument on appeal that, under APA Section 2.2, the conflict between the Agreements must be resolved in favor of the dictates of the DTCC Letter, is not compelling. Section 2.2 provides: "Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to the Purchaser." However, the DTCC Letter does not reference the CBAs at all, let alone with the specificity required for the operation of Section 2.2's preference for the APA's designation of Excluded Assets. For that reason, any ambiguity that remains in the DTCC Letter, or as between the agreements, must be resolved by extrinsic evidence.

We do not find clear error in the bankruptcy court's assessment of extrinsic evidence. There was at least some extrinsic evidence in support of each party's contention. For example, the Deputy General Counsel of the DTCC testified regarding telephonic negotiations in which Barclays purportedly agreed to give up the CBAs. Nonetheless, the bankruptcy court found, and we agree, that the weight of evidence tipped markedly in Barclays's favor. Specifically, the parties' post-closing conduct in approving the CL and finalizing Schedule B evinced an intent to transfer the CBA assets. This intent is supported by

20

the testimony of Barclays's lawyers as well as an email of DTCC's outside counsel to the effect that DTCC agreed to accept Barclays's $250 million limited guarantee and in turn relinquish the CBAs. As the bankruptcy court noted, the weight of the extrinsic evidence also comports with the commercial reality of the deal, which saw DTCC incur losses far below the $250 million guarantee provided by Barclays, who took on the lion's share of the risk.[7]

## CONCLUSION

For the reasons stated above, we affirm the district court.

---

[7] The Trustee also asserts that, even if the CL is read to transfer the CBAs to Barclays, it does so only because the lawyers representing Lehman during the drafting of the CL were unaware that Barclays had agreed to exclude the CBAs via the DTCC Letter. This contention contradicts the district court's finding regarding the weight of extrinsic evidence and is also belied by the record on appeal, which indicates that Lehman's lawyers were briefed on the DTCC agreement, saw several drafts of the resulting DTCC Letter, and elsewhere amended the CL to conform with the DTCC Letter. Moreover, counsel for Barclays and Lehman worked together and agreed on the finalized list of Purchased Assets in Schedule B, which included the CBAs. The Trustee received a copy of Schedule B and signed both the CL and the DTCC Letter; he cannot now contest the CL's unambiguous language based on a lack of knowledge of its terms.

21