OPINION OF THE COURT
Anthony L. Parga, J.
*981 Ordered that the motion by plaintiff the Northwestern Mutual Life Insurance Company pursuant to CPLR 3212 for an order deleting the name of Norman Stark from the caption, deleting the names of “John Doe #1” through “John Doe #12” and replacing same with WFC-1 Realty Corp., awarding summary judgment to plaintiff and an order appointing a referee to compute as against defendant Uniondale Realty Associates is granted in part and denied in part, and so much of the motion as seeks summary judgment with respect to a prepayment fee or premium is denied, and upon searching the record the claim for such fee is dismissed (CPLR 3212 [b]), and the application is granted in all other respects. So much of the motion as seeks summary judgment as against defendant WFC-1 Realty Corp. is withdrawn. The cross motion by defendant tenant WFC-1 Realty Corp. to dismiss is withdrawn.
This is an action for foreclosure upon commercial premises owned by defendant Uniondale Realty Associates. The underlying consolidation of notes (the note or loan agreement), dated March 3, 1997, provides for an $11 million loan payable in $96,160 monthly installments of principal and interest. The term runs from March 15, 1997 to September 15, 2015, with an interest rate of 8.16% per annum, and a default rate of 13.16%. The note permits prepayment, but under a “lock-in provision” does not permit prepayment before September 15, 2003. In exchange for any prepayment prior to the end of the term, the note provides for a “premium” computed pursuant to a treasury based “yield maintenance” formula. The computation of “yield maintenance” provides a lender with the monetary equivalent of the value represented by its “loss [of] the long term secured return it suffers when a loan is repaid” (Current Issues Concerning Mortgage Prepayment, 478 PLI/Real 871, 891-892 [Feb. 2002]).
Additionally, the note also provides for payment of that prepayment premium in the event there is a payment beyond the sum in default (thereby constituting a prepayment) after default and acceleration. It is the applicability of this prepayment premium after default and acceleration clause which presents the only genuine issue upon summary judgment. The prepayment premium plaintiff seeks exceeds $2 million, approximately 23% of the outstanding principal.
To establish a prima facie case in an action to foreclose a mortgage, the plaintiff must establish the existence of the mortgage and mortgage note, ownership of the mortgage, and *982 the defendant’s default in payment (Campaign v Barba, 23 AD3d 327 [2d Dept 2005]). Defendant has failed to note any factual issue with regard to bona fide mortgage ownership in the public record, and plaintiff established a prima facie entitlement to summary judgment as a matter of law, with the sole exception of the prepayment fee or premium.
The note contains the following or prepayment premium clause which states:
“Borrower shall have the right, upon thirty (30) days advance written notice, beginning December 15, 2003 of paying this note in full with a prepayment fee. This fee represents consideration to Lender for loss of yield and reinvestment costs. The fee shall be the greater of Yield Maintenance or 2% of the outstanding principal balance of this note on the date of prepayment” (emphasis supplied).
Yield maintenance is achieved in the note through the use of a United States Treasury based formula which ostensibly seeks to duplicate the secured return as consideration for premature payment, i.e., prepayment. This premium represents a type of unaccrued interest. The note formula calculates the difference between certain United States Treasury interest yields and the contract interest yield, and applies the percentage difference to the outstanding principal reduced to present value to determine the premium. For clarity and consistency of reference, the court will continue to refer to the prepayment fee as a prepayment “premium.”
The note also includes the following relevant language:
“In the event of a prepayment of this note following (i) the occurrence of an Event of Default . . . followed by the acceleration of the whole indebtedness evidenced by this note . . . such prepayment will constitute an evasion of the prepayment terms . . . and be deemed to be a voluntary prepayment . . . and such payment will, therefore, . . . include the prepayment fee required under the prepayment in full privilege recited above” (emphasis supplied).
This “evasion” clause allows for collection of the prepayment premium after default and acceleration. However, can there be true prepayment after default acceleration when the whole of the obligation is due and owing? As stated by one court:
“ ‘ “Prepayment” is a payment before maturity. “Acceleration” is a change in the date of maturity from the future to the present. Once the maturity date is *983 accelerated to the present, it is no longer possible to prepay the debt before maturity. Any payment made after acceleration of the maturity date is payment made after maturity, not before.’ ” (Rodgers v Rainier Natl. Bank, 111 Wash 2d 232, 237, 757 P2d 976, 978 [1988]; see, also, Matter of LHD Realty Corp., 726 F2d 327, 330-331 [7th Cir 1984].)
The court concludes that the latter-quoted clause is intended to prevent evasion of the premium required for prepayment simply on grounds that a default and acceleration have occurred, or that the prepayment is involuntary. Those instances where a prepayment is considered involuntary, e.g., a sale in condemnation, are not at issue here (see Silverman v State of New York, 48 AD2d 413, 414 [3d Dept 1975]). The function indicated by the language used, particularly the word “evasion” which means “to escape or avoid, especially by cunning or trickery” (Word-Perfect dictionary), is to prevent avoidance of the premium by an intentional default. In relevant part, the thrust of the evasion clause is to penalize any attempt on the part of the borrower to prepay without including paying the premium.
This meaning is clear when the language is examined in light of the historical development of prepayment maintenance clauses, and particularly yield maintenance clauses. A review of the history of commercial prepayment clauses and the recent origins of yield maintenance provisions is essential to understanding of the purpose and context of the wording of the subject clause.
As noted, in conformity with the current lending trend, the subject note contains a “yield maintenance” provision which “peg[s] the prepayment premium to the difference between the original mortgage interest rate and the market rate of a Treasury obligation of comparable maturity” (see, Current Issues Concerning Mortgage Prepayment, 478 PLI/Real 871, 936, 919, supra).
“Yield maintenance formulas are calculated to cover [a] lender’s reinvestment loss when prepaid loans bear above market rates” (Lefcoe, Yield Maintenance and Defeasance: Two Distinct Paths to Commercial Mortgage Payment, 478 PLI/Real 871, 935, Appendix). Under a yield maintenance formula, the borrower “discharges the debt with a one time fee sufficient to enable the lender, reinvesting at current rates, to earn no less than what it would have earned had the borrower not prepaid” (id.). The salient relation of a yield maintenance formula to market rates is explained as follows:
*984 “When the prepayment occurs for the purpose of refinancing, of course the lender will suffer some loss since typically the market for money is lower than [the] rate on the note, or the borrower would have no incentive to refinance. The extra interest ‘kicker’ represented by the prepayment premium reflects the fact that the lender will have some time delay before being able to place that loan. But if the prepayment occurs in connection with some other event, such as the sale of the property or for some involuntary payment. . . then a court may conclude that the lender ought to be able to re-lend at the same or higher return, even taking the cost of replacing the loan into account” (see, Current Issues Concerning Mortgage Prepayment, 478 PLI/ Real 871, 880, supra).
Accordingly, if the existing loan interest rate is significantly below market rates, the lender may not suffer any damages from the loss of the contract yield, notwithstanding costs associated with investigating and securing a new or replacement loan (see Lazzareschi Inv. Co. v San Francisco Fed. Sav. & Loan Assn., 22 Cal App 3d 303, 308-310, 99 Cal Rptr 417, 420-422 [1st Dist 1971]).
Under the perfect tender in time rule a mortgagor has no right to prepay a note prior to its maturity date “in the absence of a prepayment clause in the mortgage or contrary statutory authority” and such rule “has been settled law since the early 19th century” (Matter of Arthur v Burkich, 131 AD2d 105, 106 [3d Dept 1987]). Thus a lender or mortgage investor has the absolute right to rely upon the income stream contracted for over the life of the loan (Arthur v Burkich, supra at 107; Westmark Commercial Mtge. Fund IV v Teenform Assoc., L.P., 362 NJ Super 336, 344, 827 A2d 1154, 1158-1159 [App Div 2003]). It is this right which is the foundation of yield maintenance theory.
When a prepayment clause is included as part of the loan obligation, it is generally analyzed as an “option” for alternative performance on the loan, and any premium is deemed consideration or a quid pro quo for the option (see, e.g., Poughkeepsie Galleria Co. v Aetna Life Ins. Co., 178 Misc 2d 646, 648 [Sup Ct, Dutchess County 1998]; In re United Merchants & Mfrs., Inc., 674 F2d 134, 140 n 7 [2d Cir 1982]; Boyd v Life Ins. Co. of Southwest, 546 SW2d 132 [Tex Ct Civ App Houston 1977]; Meyers v Home Sav. & Loan Assn., 38 Cal App 3d 544, 113 Cal *985 Rptr 358 [2d Dist 1974]). Ordinarily, such a premium is not enforced as liquidated damages because there has been no breach of the loan agreement, merely alternative performance which is intended to preserve the lender’s income stream or yield (see, e.g., Lazzareschi Inv. Co. v San Francisco Fed. Sav. & Loan Assn., 22 Cal App 3d 303, 307, 99 Cal Rptr 417, 420 [1st Dist 1971]; but see In re A.J. Lane & Co., Inc.,, 113 BR 821, 828 [D Mass 1990] [rejects alternative performance analysis and treats prepayment “penalty” as liquidated damages]; see also Current Issues Concerning Mortgage Prepayment, 478 PLI/Real 871, 879 [discussing treatise and law review treatment of the subject]).
Lender has attempted to recover prepayment premiums after default and acceleration in order to preserve an income stream, and absent any “voluntary” prepayment. A prepayment premium will not be enforced under default circumstances in the absence of a clause which so states (3C Assoc. v IC & LP Realty Co., 137 AD2d 439 [1st Dept 1988]; George H. Nutman, Inc. v Aetna Bus. Credit, 115 Misc 2d 168 [Sup Ct, Queens County 1982]; Matter of LHD Realty Corp., 726 F2d 327 [7th Cir 1984]). In the event that a court concludes that the borrower has defaulted intentionally in order to trigger acceleration and thereby avoid or evade a prepayment premium, the prepayment clause may be enforced, notwithstanding substantial authority which requires an explicit agreement to allow a premium after acceleration (Eyde Bros. Dev. Co. v Equitable Life Assur. Socy. of U.S., 697 F Supp 1431 [WD Mich 1988], affd 888 F2d 127 [6th Cir 1989]; Matter of LHD Realty Corp., 726 F2d 327, 331 [7th Cir 1984]; Rodgers v Rainier Natl. Bank, 111 Wash 2d 232, 757 P2d 976 [1988]).
When a clear and unambiguous clause which calls for payment of the prepayment premium or a sum equal thereto at any time after default, and acceleration is included in the loan agreement, such clause is analyzed as liquidated damages and is generally enforceable (see, TMG Life Ins. Co. v Ashner, 21 Kan App 2d 234, 249, 898 P2d 1145, 1158 [1995]; In re Financial Ctr. Assoc. of E. Meadow, L.P., 140 BR 829, 835-836 [ED NY 1992]; In re United Merchants & Mfrs., Inc., 674 F2d 134 [2d Cir 1982]; Parker Plaza W. Partners v UNUM Pension & Ins. Co., 941 F2d 349 [5th Cir 1991]).
In New York, there is a two-tier test for liquidated damages. In order to be subject to enforcement, liquidated damages must bear “a reasonable proportion to the probable loss” and the *986 amount of actual loss must be “incapable or difficult of precise estimation” (Truck Rent-A-Ctr. v Puritan Farms 2nd, 41 NY2d 420, 425 [1977]). Lost interest, whether designated as an income stream, or contracted for yield or unaccrued or unearned interest, is not difficult to ascertain with respect to an amortized loan. Indeed, amortization schedules outline precise interest payments due over the life of the loan. Because both actual and liquidated damages are recoverable damages when the predicate for the awards “differ[ ] in kind” (Wechsler v Hunt Health Sys., Ltd., 330 F Supp 2d 383, 426 [SD NY 2004]; J.E. Hathaway & Co. v United States, 249 US 460, 464 [1919]), if it is possible to ascertain actual damages for unaccrued interest, liquidated damages for costs in relending, which may be difficult to estimate, can be provided for separately. These issues have not been addressed in a State of New York court. The question crucial to a “yield maintenance” recovery in foreclosure in New York is whether the court will enforce an agreement which provides for collection pursuant to a formula which frequently and significantly allows for a sum greater than that contracted for, i.e., accrued and unaccrued interest plus liquidated damages to cover the cost of relending, in addition to other penalties in foreclosure such as late payment fees and default interest rates. The question raised by defendant Uniondale also is significant, as New York does not permit collection of unearned (unaccrued) interest as damages after acceleration (see, Atlas Fin. Corp. v Ezrine, 42 AD2d 256 [1st Dept 1973] [unearned part of interest must be deducted upon acceleration and payment of indebtedness prior to maturity]). Such questions would present themselves if the subject clause were worded differently. However, this court need not reach such issues at this time, as the subject clause is not applicable in foreclosure.
Analysis begins with the acknowledgment that parties to the agreement are sophisticated business entities, presumably represented by able counsel, and that a contract should be enforced according to its terms (W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]), unless an agreed upon liquidated damages provision is found to constitute an unenforceable penalty (Truck Rent-A-Ctr. v Puritan Farms 2nd, 41 NY2d 420 [1977]). The Court of Appeals has “cautioned generally against interfering with parties’ agreements” citing authority which notes a trend toward “enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation” (JMD Holding Corp. v Congress Fin. Corp., 4 NY3d 373, 380, 381 [2005]).
*987 Analysis of the subject clause reveals that its plain and unambiguous meaning precludes enforcement in this action. Interpretation of an unambiguous contract provision “is a function for the court,” as is whether the agreement “on its face is reasonably susceptible of more than one interpretation” (Chimart Assoc. v Paul, 66 NY2d 570, 572-573 [1986]). The wording of the subject clause does not reveal any intent to provide for enforcement in foreclosure, whether in redemption or sale, particularly when compared to other postacceleration liquidated damages clauses providing for collection of a yield maintenance premium.
A review of language used in other such clauses is instructive. In the case of Matter of Schaumburg Hotel Owner Ltd. Partnership (97 BR 943, 953 [ND Ill 1989]), a premium was found due based on language which made the premium due and payable upon default and acceleration. Here it is not default and acceleration which causes the prepayment premium to become due and payable. Instead, “prepayment” is the predicate for a claim to the premium, albeit when it is attempted after default and acceleration. Unlike the former, which is automatic upon default and acceleration, the latter is not. The time for enforcement must await “prepayment” (see also Westmark Commercial Mtge. Fund IV v Teenform Assoc., L.P., 362 NJ Super 336, 343, 827 A2d 1154, 1158 [App Div 2003] [“borrower specifically acknowledges and agrees that it shall be liable for the prepayment premium on any acceleration of this note in accordance with its terms at any time. In the event of an acceleration¡ the prepayment premium . . . shall be due and payable as of the date on which a notice of default and acceleration is sent by holder” (emphasis supplied)]; Current Issues Concerning Mortgage Prepayment, 478 PLI/Real 871, 917-918, Appendix B [“In the event there is an uncured event of default under the Note and Lender exercises its right pursuant to the Note to declare the unpaid principal balance of the Note to be immediately due and payable, then, in addition to all of the other rights and remedies available to Lender under the Loan Documents, Borrower shall immediately pay to Lender the Prepayment Premium” (emphasis supplied)]).
A comprehensive clause also using default and acceleration as the trigger for collection of a prepayment premium is that in TMG Life Ins. Co. v Ashner, which states:
“The whole of the principal sum and interest, together with the prepayment premium . . . and the *988 costs and attorneys’ fees incurred by the Holder hereof in collecting or enforcing payment thereof, shall become due and payable at the option of the Holder hereof, after default in the receipt of payment of any principal hereof, interest thereon, or the payment of any other sum due hereunder or under the terms of the Mortgages or the Security Documents” (TMG Life Ins. Co. v Ashner, 21 Kan App 2d 234, 249, 898 P2d 1145, 1158 [1995]).
Although this clause provides for an option, it is solely the default and acceleration which permits its exercise.
The final example for comparison is of particular interest for two reasons, its explicit and defined comprehensiveness, and its inclusion in the Appendices to Current Issues Concerning Mortgage Prepayment, where the subject evasion clause and one quoted above both appear (see Appendices B, C). The clause outlined in Appendix D contains the following language:
“Prepayment Fee.
“(a) Any tender of payment by Borrower or any other person or entity of the Secured Indebtedness, other than as expressly provided in the Loan Documents, shall constitute a prohibited prepayment. If a prepayment of all or any part of the Secured Indebtedness is made following (i) an Event of Default and an acceleration of the Maturity Date, (ii) the application of money to the principal of the Loan after a casualty or condemnation, or (iii) in connection with a purchase of the Property or a repayment of the Secured Indebtedness at any time before, during or after, a judicial or non-judicial foreclosure or sale of the Property, then to compensate Holder for the loss of the investment, Borrower shall pay an amount equal to the Prepayment Fee.” (Current Issues Concerning Mortgage Prepayment, 478 PLI/Real 871, 923-924, Appendix D [emphasis supplied].)
This clause is included in its entirety as an example drafted to clearly state the parties’ intent that liquidated damages in an amount equal to the prepayment fee are enforceable in connection with premature payment by anyone and at any time after acceleration. Notable is the use of language indicating “repayment” rather than “prepayment” of the secured indebtedness “at any time before, during or after, a judicial or non-judicial foreclosure or sale of the Property.” Such clause is clearly *989 intended to be enforced in a foreclosure proceeding and is not limited to “prepayment” situations after acceleration, as is the one at issue.
The foregoing disparate clauses all include a common element which the subject clause does not. The premium or its equivalent becomes due upon default and acceleration, or may become due upon exercise of an option. There can be no argument concerning when or if the premium became due if the premium can be sought in foreclosure, when expressly so provided in the clause.
If it was the intent of the plaintiff to include within the reach of the premium evasion clause any payment, such as one at a foreclosure sale, or a redemption during the proceeding and prior to the sale, the premium subject evasion clause does not express such intent. Nor does it make default and acceleration the only predicate for collection of the premium. As enunciated by way of case law addressing yield maintenance liquidated damages clauses, such provisions should not be enforced unless clear contract language “requires it” (see, e.g. Westmark Commercial Mtge. Fund IV v Teenform Assoc., L.P., 362 NJ Super 336, 346, 827 A2d 1154, 1160 [2003], quoting Restatement [Third] of Property [Mortgages] § 6.2, Comment c [1997]; Village of Rosemont v Maywood-Proviso State Bank, 149 Ill App 3d 1087, 501 NE2d 859 [1st Dist 1986]). These cases note that if redemption were to occur, and there were evidence to suggest that it constituted a ploy to avoid the premium, such issues could be addressed (see, e.g., Matter of LHD Realty Corp., 726 F2d 327, 331 [7th Cir 1984]).
However, the facts of this case do not suggest a ploy, as the cause for Uniondale’s default in mortgage payments appears related to nonpayment of rent by its sole tenant, defendant WFC-1 Realty Corp.
The critical language in the subject clause is “in the event of a prepayment” and “evasion.” In the event of a prepayment of the entire mortgage after a default and acceleration, the premium must be paid. In light of the above outlined history and examples of premium collection clauses, the language here does no more than anticipate and thwart any attempt by a mortgagor to intentionally trigger acceleration in order to secure the benefits of prepayment in a favorable market while at the same time avoiding the bargained for premium (see, Eyde Bros. Dev. Co. v Equitable Life Assur. Socy. of U.S., 697 F Supp 1431 [WD Mich 1988], affd 888 F2d 127 [6th Cir 1989]; Matter of *990 LHD Realty Corp., 726 F2d 327, 331 [7th Cir 1984]; Rodgers v Rainier Natl. Bank, 111 Wash 2d 232, 757 P2d 976 [1988]).
Significantly, the subject clause eliminates the need to prove that prepayment after acceleration is an intentional avoidance of the premium, as prepayment after acceleration is “deemed” voluntary and an avoidance. The clause does not, however, contain language indicating prepayment application in foreclosure, redemption or any other payment. If the word “prepayment” in the subject clause was intended to include “redemption” in the context of foreclosure, it would be expressly included, as was done in the aforementioned examples.
Moreover, once a foreclosure proceeding is commenced, the language “in the event of prepayment” suggests that such prepayment is merely a contingency. Whereas in foreclosure, payment, either denominated payment repayment or prepayment, is not a contingency. A foreclosure proceeding results in payment, either by way of redemption or sale. Thus the words “in the event of’ payment are superfluous in that they contemplate that the prepayment is a contingency.
An additional issue exists regarding plaintiffs claim that the evasion clause is applicable when the loan is in foreclosure status. It is undisputed that the premium becomes due upon prepayment. If prepayment was contemplated in conjunction with redemption, a foreclosure referee’s computation could occur prior to a mortgagor’s exercise of the equity right of redemption. Hence, the judgment of foreclosure would not include the amount due to lack of “default and acceleration” as the trigger event. The aforementioned analysis of other prepayment clauses clearly distinguishes the language of the clause at issue. Redemption could occur any time until the sale, thus making recalculation of sums due necessary. Any attempt to compute this sum if not triggered would waste judicial and litigant resources. The failure to provide for a trigger consistent with New York procedures of foreclosure, while not determinative, is indicative that the parties did not contemplate enforcement in foreclosure.
The court has taken a careful analysis of the evolution of prepayment clauses and their interpretations in nonbankruptcy contexts. In light of the aforementioned survey showing the history of prepayment premiums and express language used for postacceleration premiums, the court finds this clause relevant solely where there is an attempt at prepayment after a default and acceleration but prior to commencement of a foreclosure ac *991 tion. Thus, the prepayment premium is not recoverable in this proceeding.
Defendant’s additional arguments against summary judgment contend that plaintiff did not give proper notice to cure at Uniondale’s address, or present the required receipt for certified mail. The court rejects this. The notice was addressed to Uniondale, c/o Philips International Holding Corp., 295 Madison Avenue, 2d Floor, New York, New York 10017, at Union-dale’s request and defendant does not deny receipt of the notice. Moreover, the mortgage and note did not mandate notice to a particular address, and proof of certified mail has been produced.
The second issue in opposition to this motion addresses recourse liability. The consolidation note provides that there is no liability to defendant for a deficiency judgment except with respect to certain limited recourse obligations. Uniondale contends that no proof of such obligations has been shown. The court finds this argument is premature. The relevant note provision states that the borrower will not be liable for a deficiency, and that lender will not attempt to collect any deficiency. However, the provision shall not prevent the lender from “seeking and obtaining a judgment against Borrower, and Borrower shall be personally liable for the Recourse Obligations.” If no recourse sums are due during this proceeding, none can be presented or computed. If such sums arise during this proceeding, plaintiff will not be precluded from seeking a deficiency judgment after the sale in foreclosure to the extent of such recourse obligations.
Defendant’s arguments concerning lack of standing are also rejected, as plaintiff has made out a prima facie case, in part based upon the public record. The complaint, contrary to Union-dale’s contention, is signed by an officer of Northwestern. In addition, Northwestern is authorized to do business in the State of New York.
Accordingly, plaintiff is awarded summary judgment as against defendant Uniondale, with the exception of the prepayment premium, and the matter is referred to a referee to compute.