**IN RE: MPM SILICONES, LLC, et al., Debtors.**

**BOKF, N.A., Plaintiff,**

v.

**JPMorgan Chase Bank, N.A., et al. Defendants.**

**Wilmington Trust, N.A., Plaintiff,**

v.

**JPMorgan Chase Bank, N.A., et al. Defendants.**

**Case No. 14–22503–rdd**
**Adv. Proc. No. 14–08247–rdd, Adv. Proc. No. 14–08248–rdd**

United States Bankruptcy Court, S.D. New York.

Signed October 14, 2014

Milbank, Tweed, Hadley & Mccloy LLP, Attorneys for Ad Hoc Committee of Sec-ond Lien Holders, One Chase Manhattan Plaza, New York, NY 10005, By: Dennis F. Dunne, Esq., Michael L. Hirschfeld, Esq.

Simpson Thacher & Bartlett LLP, Attorneys for JPMorgan Chase, 425 Lexington Avenue, New York, NY 10017, By: William T. Russell, Jr., Esq.

Pryor Cashman LLP, Attorneys for Wilmington Savings Fund Society, FSB, as Second Lien Indenture Trustee, 7 Times Square, New York, NY 10036, By: Seth H. Lieberman, Esq., Patrick Sibley, Esq.

Akin Gump Strauss Hauer & Feld LLP, Attorneys for Apollo Global Management LLC, One Bryant Park, New York, NY 10036, By: Deborah Newman, Esq.

Irell & Manella LLP, Attorneys for Bank of New York Mellon Trust Company, 840 Newport Center Drive, Suite 400, Newport Beach, CA 92660, By: Jeffrey M. Reisner, Esq., Michael H. Strub, Jr., Esq.

Curtis, Mallet–Prevost, Colt & Mosle LLP, Attorneys for Wilmington Trust, N.A., as Trustee for the 1.5 Lien Noteholders, 101 Park Avenue, New York, NY 10178, By: Theresa A. Foudy, Esq.

Chapter 11

**CORRECTED AND MODIFIED BENCH RULING ON DEFENDANTS' MOTIONS TO DISMISS PURSUANT TO FED. R. BANKR. P. 7012**

Hon. Robert D. Drain, United States Bankruptcy Judge

I have two motions before me to dismiss the largely identical complaints of the so-called first lien trustee and 1.5 lien trustee under Bankruptcy Rule 7012, incorporating, in this instance, Federal Rule of Civil Procedure 12(c), which provides for judgment on the pleadings.

The same standard applicable to motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) applies to Rule 12(c) motions. *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429–30 (2d Cir. 2011).

In deciding these motions, therefore, the Court must assess the legal feasibility of the complaints, not weigh the evidence that might be offered in their support. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir.1999). The Court's consideration is "limited to facts stated on the face of the complaint and in the documents appended to the complaint or incorporated into the complaint by reference, as well as to matters of which judicial notice may be taken." *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1055, 127 L.Ed.2d 375 (1994). *See also DiFolco v. MSNBC Cable, LLC*, 622 F.3d 104, 111 (2d Cir.2010) ("Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect.").

The Court accepts the complaints' factual allegations as true even if they are doubtful in fact and must draw all reasonable inferences in favor of the plaintiffs. *Tellabs Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 321–23, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). However, the Court need not accept a complaint's allegations that are clearly contradicted by documents incorporated into the pleadings. *Labajo v. Best Buy Stores, LP*, 478 F.Supp.2d 523, 528 (S.D.N.Y.2007).

Moreover, the Court is not bound to accept as true "a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Instead, the complaint must state more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action and not

do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

In addition, while the Supreme Court has confirmed, in light of the notice pleading standard of Federal Rule of Civil Procedure 8(a), that a complaint does not need detailed factual allegations to survive a motion under Rule 12(b)(6)—see *Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955—its "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. If the claim would not otherwise be plausible on its face, therefore, the complaint must alleged sufficient facts to "nudge the claim across the line from conceivable to plausible." *Id.* at 570, 127 S.Ct. 1955. Otherwise, the defendant should not be subjected to the burdens of continued discovery and the worry of overhanging litigation. *Id.* at 556, 127 S.Ct. 1955.

Applying this plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Plausibility depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d at 430.

In sum, then, the Court applies a two-step approach under Rule 12(c). After identifying the elements of the applicable causes of action—*Ashcroft v. Iqbal*, 556 U.S. at 675, 129 S.Ct. 1937—the Court must first note the allegations not entitled to the assumption of truth because they are only legal conclusions, *id.* at 679–80,

129 S.Ct. 1937, and, second, it must assess the factual allegations in context to determine whether they plausibly suggest an entitlement to relief. *Id.* at 681, 129 S.Ct. 1937.

Here, the complaints (which, again, are, with the exception of an allegation about the nonpayment of a financial advisor's fees, essentially the same) rely upon the plaintiffs' rights under an Intercreditor Agreement, or ICA, a copy of which is filed on the docket and has also been attached to the declaration of Samuel A. Khalil in support of defendants' reply in support of their motions.

The complaints assert claims for various alleged breaches of the Intercreditor Agreement. They also seek declaratory relief regarding the meaning of the ICA and injunctive relief against future breaches. Finally, the complaints assert a breach of the implied covenant of good faith and fair dealing.

■ As the parties acknowledge, the Intercreditor Agreement is governed by New York law, which, with respect to the interpretation of contracts like the ICA, is clear. Under New York law, the best evidence, and, if clear, the conclusive evidence, of the parties' intent is the plain meaning of the contract. Thus, in construing a contract under New York law, the Court should look to its language for an agreement that is complete, clear, and unambiguous on its face; and, if that is the case, it must be enforced according to its plain terms. *J. D'Addario & Company Inc. v. Embassy Industries, Inc.*, 20 N.Y.3d 113, 118, 957 N.Y.S.2d 275, 980 N.E.2d 940 (2012); *Greenfield v. Philles Records Inc.*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002).

■ Ambiguity is a question of law. *Consedine v. Portville Cent. School District*, 12 N.Y.3d 286, 294, 879 N.Y.S.2d 806, 907 N.E.2d 684 (2009). A contract is ambiguous if its terms are "susceptible to more than one reasonable interpretation." *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458, 775 N.Y.S.2d 757, 807 N.E.2d 869 (2004). *See also British International Insurance Company v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir.2003), in which the court states, "An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."

■ Thus, while in instances of ambiguity the Court may look to parol evidence, if the agreement on its face is reasonably susceptible to only one meaning, that meaning governs; the Court is not free to alter the contract to reflect its notions of fairness or equity or extrinsic facts. *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d at 569, 750 N.Y.S.2d 565, 780 N.E.2d 166. *See also In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir.2013).

■ In construing a contract, one should be aware that an entire agreement is being examined, and, therefore, the Court should interpret the contract to give full meaning and effect to all of its provisions. *Id.* at 98. An isolated provision that might be susceptible to one or more readings thus should not be taken out of context but should be read, instead, in the context of the entire agreement, or construed in a way that is plausible in the context of the entire agreement. *See Barclays Capital, Inc. v. Giddens*, 761 F.3d 303 (2d Cir.2014).

Here, as I noted, the parties are disputing the defendants' obligations under the

Intercreditor Agreement attached as an exhibit to Mr. Khalil's declaration. As I noted in my previous ruling on confirmation of the debtors' chapter 11 plan, the ICA is very clearly an intercreditor agreement pertaining to the parties' rights in respect of shared collateral. That is the overall context of the Agreement, and it is in that context that the complaints' claims should be evaluated.

The complaints allege that the defendants breached the Intercreditor Agreement by taking positions before and during the course of this bankruptcy case in opposition to the plaintiffs. More specifically, the complaints assert that the defendants breached the ICA (a) by entering into a Restructuring Support Agreement before the commencement of the case in favor of what eventually became the debtors' chapter 11 plan and then supporting confirmation of that plan, which the complaints allege adversely treats the plaintiffs by "cramming down" the plaintiffs' claims under section 1129(b) of the Bankruptcy Code, and (b) by intervening support of the debtors' objections to the plaintiffs' right to a make-whole payment under their indentures and notes and similar claims based on the prepayment of their debt.

The plaintiffs also contend that the defendants breached the Intercreditor Agreement (a) by supporting the debtors' financing (apparently, although not expressly stated in the complaints, the post-petition or "DIP" financing under section 364 of the Bankruptcy Code as approved by the Court) that was given a lien with priority over the plaintiffs' liens, and (b) by opposing the plaintiffs' requests for adequate protection of their interests in the shared collateral and, as more specifically alleged in the first lien trustee's complaint, objecting to the ongoing reimbursement of the first lien trustee's financial advisor's fees and expenses during the course of this case as a proposed form of adequate protection of the trustee's lien.

Lastly, and perhaps most significantly for purposes of the underlying economics of this litigation, the complaints allege that the defendants breached the Intercreditor Agreement by agreeing to receive in return for their secured claims property that the plaintiffs contend constitutes "Common Collateral," a defined term in the Intercreditor Agreement, or the proceeds thereof, while holding that property in trust for the plaintiffs until the plaintiffs' "Senior Lender Claims"—another defined term in the Agreement—have been paid in full in cash.

The Common Collateral or its proceeds allegedly improperly retained by the defendants as secured creditors includes (a) a potential $30 million charge under a Backstop Agreement pursuant to which defendants agreed to backstop a $600 million rights offering to partially fund the chapter 11 plan, (b) the fees and expenses of various counsel and financial advisors for the plaintiffs that the debtors have reimbursed on an ongoing basis during the course of this case, which apparently (although I am not prepared to find this conclusively for reasons discussed below) were paid pursuant to the Restructuring Support Agreement between the debtors and defendants that was eventually approved by the Court, although possibly also paid as a form of adequate protection of the defendants' interests in the shared collateral, and (c) 100 percent of the common stock of the reorganized parent debtor, to be distributed to the defendants under the chapter 11 plan in exchange for their claims against the debtors.

The complaints rarely, if ever, specify the provisions of the Intercreditor Agreement that are claimed to have been breached by the foregoing conduct. I have reviewed the ICA, therefore, to see

what provisions might apply and also requested counsel during oral argument to highlight the provisions that they believe apply.

■ Let me address first the complaints' claims based on the defendants' alleged objections to the plaintiffs' receipt of adequate protection of their interests in the shared collateral and the claims based on the defendants' alleged support of a priming lien. Section 6.3 of the ICA provides, "No Second–Priority Party [which admittedly would include the defendants] will contest or support any other person contesting (a) any request by the Senior Lenders for adequate protection, or (b) any objection by the Senior Lenders to any motion based on the Senior Lenders' claiming a lack of adequate protection."

The first lien trustee's complaint alleges in a conclusory fashion that the defendants either contested or supported other persons in objecting to the first lien holders' right to adequate protection of their liens in the shared collateral. The complaint's only non-conclusory assertion of such conduct is its allegation that the defendants objected to the current payment, as a form of adequate protection, of the fees and expenses of the financial advisor for the first lien trustee. The complaint does not state, however, how the defendants raised such an objection. I am not aware of any such action taken by the defendants in court, moreover, and such an objection does not appear on the docket. I conclude, therefore, that the first lien trustee's complaint does not satisfy the initial requirement of *Twombly, Iqbal* and *L–7 Designs,* namely, that on this claim it states no more than a conclusory recitation of the cause of action. The 1.5 lien trustee's complaint lacks even the allegation of an objection by the defendants to any specific aspect of proposed adequate protection; therefore, it, too, fails the first prong

of *Twombly, Iqbal* and *L–7 Designs* and does not assert a claim for breach of section 6.3 of the ICA.

I could go further, as the defendants also request, and hold that under no circumstances would the defendants' objection to the provision of adequate protection of the plaintiffs' interests in the shared collateral, including in the form of reimbursement of advisors' fees, ever give rise to a cause of action for breach of section 6.3 of the ICA, but I am reluctant to do so without seeing more of what the defendants are alleged to have done to breach that provision.

To persuade me otherwise, the defendants rely heavily on a decision that also construed an intercreditor agreement pertaining to the rights of secured creditors in shared collateral, *In re Boston Generating LLC,* 440 B.R. 302 (Bankr. S.D.N.Y.2010). The agreement at issue in that case, like the ICA, expressly acknowledged the right of the junior, or second-priority lien holders to assert their rights as *un* secured creditors; and Judge Chapman concluded, based on her finding that the junior lien holders' allegedly wrongful conduct comprised no more than the assertion of rights available to unsecured creditors, that such holders were not prohibited from objecting to a sale of the shared collateral that was supported by the senior lien holders notwithstanding other provisions in the agreement that precluded them from taking actions contrary to the senior lien holders' rights in the collateral (although she found it "a very close call"). *Id.* at page 320.

Here, the ICA's provision permitting the second-priority secured parties to act in their capacity as unsecured creditors is quite broad, and, as in *Boston Generating,* the plaintiffs concede that the defendants have a substantial unsecured, deficiency claim under section 506(a) of the Bankruptcy Code, that is, that the defendants

also are unsecured creditors with rights to assert under the provision. Section 5.4 of the Intercreditor Agreement, titled "Rights as Unsecured Creditors," provides, *"Notwithstanding anything to the contrary in this Agreement,* the Second–Priority Agents and the Second–Priority Secured Parties *may exercise rights and remedies as an unsecured creditor against the Company* or any Subsidiary that has guaranteed the Second–Priority Claims in accordance with the terms of the applicable Second–Priority Documents and applicable law." (Emphasis added.) The defendants argue that this provision trumps ICA section 6.3's prohibition of objections to any request by the senior lienholders for adequate protection, because such an objection to the debtors' proposed grant of adequate protection could be equally raised by an unsecured creditor.

I can see a possible plausible reading of ICA section 5.4, however, that might require a more nuanced approach to actions of the second lien holders that conflict with other provisions of the ICA. For example, if the debtors were advocating a reasonable treatment of the first and 1.5 lien holders' interests in the shared collateral that the second lien holders opposed, once could question whether the second lien holders were exercising "rights and remedies . . . *against the [debtors]* " as required by the exemption in ICA section 5.4, because the debtors were doing nothing objectionable. Judge Chapman made a similar observation in *Boston Generating,* 440 B.R. at 320, distinguishing the junior lien holders' conduct in that case from the "obstructionist behavior" of the junior lien holder in *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd.,* 419 B.R. 585, 588–89, 595–95 (Bankr. S.D.N.Y.2009), *app. dismissed,* 480 B.R. 494 (S.D.N.Y. 2012). In other words, ICA section 5.4, when read in context with other provisions of the ICA, may require the

junior lien holders to assume the risk that they do not have a valid argument to oppose the debtors' proposed action. However, not having sufficient facts stated in the complaints, I am not prepared to rule either way on this point. Thus, I will simply hold that any claim in either complaint based upon an alleged breach of ICA section 6.3 is dismissed on the ground that, as pled, such claim does not pass the first test of *Twombly, Iqbal* and *L–7 Designs,* having been asserted in a merely conclusory fashion that leaves both the defendants and the Court guessing at the claim's factual basis.

■ The complaints' claim based on the defendants' support of a priming lien in a third-party financing also fails to state what actions the defendants took to support the issuance of such a lien. Moreover, the complaints' failure to identify the particular section of the Intercreditor Agreement allegedly breached takes on greater significance because, based on my review, the ICA nowhere prohibits junior lien holders from supporting a priming lien financing, and counsel have not identified one. In fact, it appears that the only prohibition in the ICA relating to priming liens bars objections to such liens that are *supported* by the senior lien holders.

The plaintiffs acknowledged at oral argument, moreover, that they never objected to the priming lien in the DIP financing and stated that they view this claim as being more akin to their other unspecified claims for breach of ICA section 6.3, namely, that it relates to unspecified objections to the provision of adequate protection to the senior lien holders' interests in the shared collateral that arose in the context of the debtors' motion for approval of the DIP financing. This, of course, makes the claim even more nebulous.

Therefore, for the same reasons that I dismissed the complaints' claim based upon ICA section 6.3, I will also dismiss any claim based upon alleged support for the issuance of a new priming lien, although I reiterate that the factual support in the record—and obviously I can take judicial notice of the docket of this case—as well as any support for this claim in the ICA, other than, arguably, if facts are further pled to fit it into section 6.3 of the ICA, is lacking.

■ Next, the complaints assert claims that the defendants have violated the Intercreditor Agreement by supporting (a) the debtors' objection to the first and 1.5 lien holders' right to a make-whole payment or similar claim based on the plan's prepayment of their debt, and (b) confirmation of the debtors' chapter 11 plan over the plaintiffs' objections on a cramdown basis. As to the first claim, the plaintiffs have conceded that if the Court's ruling disallowing their make-whole right as a matter of New York law becomes a final order, they would not have a claim for breach of the ICA based on the defendants' support of the debtors' position on the issue. I believe the same logic would apply to the defendants' support of the debtors' objection (a) to the plaintiffs' claim under New York law based on a non-call right, which I found in the same ruling the plaintiffs lack because there is no specific non-call provision in their indentures and notes, and (b) to the plaintiffs' claim based on the debtors' alleged breach of New York's rule of perfect tender, which precludes any prepayment of a note.

There is no final order in this case on these issues, as they are subject to pending appeals. However, I believe that in reviewing the complaints I should follow my prior rulings, which are the law of the case, on the plaintiffs' lack of either a make-whole right or a non-call claim under

New York law and, therefore, find, as conceded, that the ICA has not been breached by the defendants' support of the debtors' claim objections. I also believe, although not having expressly found before, that the make-whole provisions in the first and 1.5 lien indentures and notes modified New York's rule of perfect tender, and, therefore, that the plaintiffs would not have a claim under New York law for breach of that rule, which is modifiable by contract, either. *See U.S. Bank National Association v. South Side House, LLC,* 2012 WL 273119, at *4, 2012 U.S. Dist. LEXIS 10824, at *12–13 (E.D.N.Y. Jan. 30, 2012); *Northwestern Mutual Life Ins. Co. v. Uniondale Realty Assoc.,* 816 N.Y.S.2d 831, 835, 11 Misc.3d 980, 984 (N.Y.Sup.Ct.2006); *see generally* Charles & Kleinhaus, "Prepayment Claims in Bankruptcy," 15 Am. Bankr.Inst. L.Rev. 537, 541 (Winter 2007). (My prior decision on the plaintiffs' right to such a claim was not based on that conclusion because I found that the claim would not be allowed, in any event, under sections 502(b)(2) and 506(b) of the Bankruptcy Code.) Thus, by supporting the debtors' objections to these claims, the defendants did no more than ensure that the debtors objected to claims that do not exist under state law; as conceded by the plaintiffs, the defendants cannot be liable under the ICA for objecting to invalid claims.

There are other, alternative reasons, moreover, why the complaints fail to assert a claim based on the defendants' objections to the make-whole and related claims and their support of confirmation of the debtors' plan. First, however, it is important to reiterate the context of the Intercreditor Agreement, which is well summarized in *Boston Generating*:

Interpreting text requires some discussion and understanding of context. If one were to explain, in lay terms, the

purpose and function of an intercreditor agreement between first lien parties and second lien parties, the explanation would include the notion, as the first lien agent stated, that first lien lenders would be 'in the driver's seat' when it came to decisions regarding collateral. In other words, or to use a different metaphor, the second lien lenders agree not to use their subordinated lien as an offensive weapon against first lien lenders with respect to collateral. Notwithstanding their agreement to be subordinated, second lien lenders do retain certain rights under a typical intercreditor agreement, including the right to appear and be heard in a bankruptcy case as unsecured creditors. This right includes making arguments that an unsecured creditor would have the standing (and the economic interest) to assert and those arguments that are not expressly waived by the intercreditor agreement.

440 B.R. at 318. I made a similar observation about the ICA's context in my confirmation ruling.

■■■ Judge Chapman also states in *Boston Generating*—and I believe this view is appropriate both under section 510(a) of the Bankruptcy Code, which enforces subordination agreements, and the law of New York—that waivers of a secured creditor's rights under such agreements "must be clear beyond peradventure." *Id.* at 319.

■■■ The focus, therefore, of an intercreditor agreement between two groups of secured lenders, such as the one at issue here, is on their rights in and remedies in respect of the shared collateral. That context helps explain what is, frankly, clear language in the ICA, in any event, to the extent it pertains to the types of actions that are at issue in this aspect of my ruling. Unlike actions directly pertaining

to adequate protection, which directly affect the secured creditors' interests in the shared collateral, the defendants' objections to the amount of the senior lien holders' claims under applicable law, whether it be New York or bankruptcy law, and support of the debtors' cramdown chapter 11 plan—unless very clearly precluded or constrained by an intercreditor agreement of this nature, should not be curtailed. They are not positions taken with respect to the parties' rights in the shared collateral; instead, they pertain to the amount and treatment of the senior lien holders' claims based on arguments that any unsecured creditor could reasonably make.

Here the language relied upon by the plaintiffs is not the specific language of ICA section 6.3 but a broad reading of section 3.1(c) of the ICA, which provides that

Each Second–Priority Agent, for itself and on behalf of each applicable Second–Priority Secured Party, agrees that *no Second–Priority Agent or Second–Priority Secured Party will take any action that would hinder any exercise of remedies undertaken by the Intercreditor Agent or the Senior Lenders with respect to the Common Collateral* under the Senior Lender Documents, including any sale, lease, exchange, transfer or other disposition of the Common Collateral, whether by foreclosure or otherwise; *and* each Second–Priority Agent, for itself and on behalf of each applicable Second–Priority Secured Party, hereby *waives any and all rights* it or any Second–Priority Secured Party may have as a junior lien creditor or otherwise *to object to the manner in which the Intercreditor Agent or the Senior Lenders seek to enforce or collect the Senior Lender Claims or the Liens* granted in any of the Senior Lender

Collateral, regardless of whether any action or failure to act by or on behalf of the Intercreditor Agent or Senior Lenders is adverse to the interests of the Second–Priority Secured Parties.

(Emphasis added.)

As I've stated, ICA section 5.4, however, provides that, "Notwithstanding anything to the contrary in this Agreement, the Second–Priority Agents and the Second–Priority Secured Parties may exercise rights and remedies as an unsecured creditor against the Company or any Subsidiary that has guaranteed the Second–Priority Claims in accordance with the terms of the applicable Second–Priority Documents and applicable law."

With regard to the defendants' objections to the plaintiffs' make-whole and similar claims, then, it appears clear to me—and the ICA, I believe, is unambiguous on this point—that the defendants were not acting contrary to section 3.1(c) of the Intercreditor Agreement, which pertains to objecting the plaintiffs' enforcement and exercise of remedies in respect of the Common Collateral. It is true that those remedies are to be enforced pursuant to the underlying documents, which, among other things, serve as the basis for the senior lien holders' claims, but the ICA in general, and section 3.1(c) in particular, is not a claim or debt subordination agreement. Its focus generally and in section 3.1(c) in particular is on the secured lenders' enforcement of their remedies in the collateral, not on the amount of the lenders' claims. Thus, objecting to the amount of the plaintiffs' claims would not give rise to a breach of ICA section 3.1(c) even if such objection was ultimately denied (which, of course, has not occurred here).

As I noted, the debtors already took the position that the secured lenders were not entitled to a make-whole or similar claim. Thus it seems to me that the only claim

the plaintiffs might assert against the defendants under section 3.1(c) would be based on their having egged on the debtors to object, or causing the debtors to do so, but, again, that would be consistent with the defendants' rights against the debtors under ICA section 5.4 to ensure that the debtors have acted properly, as fiduciaries to unsecured creditors, in objecting to claims that arguably do not have a basis in law.

A similar analysis was undertaken by Judge Chapman in *Boston Generating,* although the senior lien holders' representative there conceded that the lien holders were not effecting or taking enforcement actions in respect of the shared collateral when supporting the proposed sale, whereas the plaintiffs have not so conceded here. But that distinction is less significant than the fact that the defendants' claim objection was just that, a claim objection, rather than opposition to the plaintiffs' pursuit of remedies in respect of the shared collateral. In this context ICA section 5.4 must be read to give the defendants the unfettered right to act as unsecured creditors to object to the senior lien holders' claims. Such actions would not conflict with any more specific provision in the ICA in a way that might create any contextual ambiguity.

The complaints' claim based on the defendants' support of the cramdown plan is a closer question, in that cramdown under section 1129(b) of the Bankruptcy Code affects the manner in which the senior lien holders will be paid under the plan, not the amount of their claim. Thus, arguably, by supporting a cramdown plan the defendants were opposing the senior lien holders' enforcement of their lien rights in the bankruptcy case.

Again, however, the debtors advocated cramdown in any event. Thus, to the extent that the complaints could assert a

claim a based on the defendants' support of the debtors' cramdown plan, it would, again, be based upon the defendants' encouragement of the debtors to proceed on that course. This I believe, however, was permitted by ICA section 5.4. The debtors' pursuit of the cramdown plan was, as I found at least, proper under the Bankruptcy Code and applicable precedent at the Supreme Court and Second Circuit level and, therefore, I believe that the defendants' encouragement of that course was the type of action, consistent with *Boston Generating* and in contrast with Judge Chapman's citation to *Ion Media*, that any unsecured creditor would rightly take. It was not a holdup; it was, instead, consistent with ICA section 5.4, merely ensuring that the debtors acted properly in the interests of unsecured creditors in not overpaying the plaintiffs with a higher present value rate under section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code.

 Therefore, as an alternative basis for dismissing both of these claims, I conclude that the defendants' actions in support of the debtors' proper exercise of their duties to unsecured creditors with regard to the make-whole claim and the cramdown plan were permitted under section 5.4 of the Intercreditor Agreement.

In this regard, the loosely drafted ICA is quite different than the agreement in *In re Erickson Retirement Communities LLC*, 425 B.R. 309, 313 (Bankr.N.D.Tex. 2010), which contained very tight language prohibiting the junior lien holders from taking almost every action against the general interests of the senior secured party— where the junior lien holders would, in the court's phrase, be "silent seconds" and yield in all respects to the senior lien holder until the claim of the senior lien holder was fully satisfied. *Id.* at 314. Clearly, more was required here to have

rendered the defendants silent on these types of issues.

Lastly, the complaints allege that the defendants have breached section 4.2 of the Intercreditor Agreement by receiving and retaining, or supporting a chapter 11 plan under which they will receive and retain, (a) a possible $30 million charge under the Backstop Agreement in connection with the $600 million rights offering, (b) ongoing cash reimbursement of their professional fees, and (c) in return for their secured and unsecured claims, their distribution under the confirmed plan in the form of 100 percent of the new common stock of the reorganized parent debtor. It is alleged that the defendants' retention of these three forms of consideration violates paragraph 4.2 of the ICA, which states,

> Application of Proceeds. After an event of default under any First lien Indebtedness has occurred with respect to which the Intercreditor Agent has provided written notice to each Second–Priority Agent, and until such event of default is cured or waived, *so long as the Discharge of Senior Lender Claims has not occurred, the Common Collateral or proceeds thereof received in connection with the sale or other disposition of, or collection on, such Common Collateral upon the exercise of remedies, shall be applied by the Intercreditor Agent to the Senior Lender Claims* in such order as specified in the relevant Senior Lender Documents until the Discharge of Senior Lender Claims has occurred.

(Emphasis added.)

As relevant, the ICA defines "Discharge" as the *"payment in full in cash* (except for contingent indemnities and cost and reimbursement obligations to the extent no claim has been made) of (a) all Obligations in respect *of all outstanding First Lien Indebtedness."* (Emphasis

added.) Under the chapter 11 plan, the first lien and 1.5 lien holders are not being paid all of their Obligations in cash; they are instead receiving cramdown notes, with their liens continuing to attach to all of their prepetition collateral, i.e., cramdown treatment under section 1129(b)(2)(A)(i) of the Bankruptcy Code.

The plaintiffs' argument that they are entitled to receive any distributions made to the second lien holders until the senior lien holders are paid in full in cash hinges on, then, the plain language of section 4.2 of the ICA coming into play upon the second lien holders' receipt of any "Common Collateral or proceeds thereof . . . in connection with the... disposition of, or collection on, such Common Collateral upon the exercise of remedies." The plaintiffs argue that all three forms of the foregoing consideration received or to be received by the defendants constitute "Common Collateral or the proceeds thereof" received by the defendants as second lien holders "in connection with the disposition of, or collection on, such Common Collateral upon the exercise of remedies" and therefore should be turned over to the plaintiffs until the plaintiffs are paid in full in cash.

 I conclude, however, that the motions should be granted and the claims dismissed with respect to the $30 million charge under the Backstop Agreement. While that cash could be viewed as Common Collateral (although all parties recognize that such collateral does not comprise all of the debtors' assets), the payment, if made, will be based on the defendants' rights under the Backstop Agreement, not in respect of remedies as secured creditors. Such payment would not be on account of a secured obligation but, rather, a separate, unsecured obligation undertaken by the debtors to the defendants for backstopping new exit financing for the debtors

beyond the time provided in the Backstop Agreement. The defendants therefore would not be exercising remedies as secured creditors against the Common Collateral for purposes of triggering ICA section 4.2 if they receive the $30 million.

 I cannot discern the basis for the defendants' right to be reimbursed their professional fees currently during this case, because the complaints do not it make clear and no party has identified it in documents that I may consider in connection with these motions. Indeed, there may be more than one source for the defendants' right to such payments, including (a) under the Court-approved Restructuring Support Agreement in the form of an unsecured administrative expense, which, as not deriving from the exercise of remedies against the Common Collateral, may not support a claim under section 4.2 of the Intercreditor Agreement, and/or (b) as part of the provision of adequate protection of the defendants' lien, which arguably would violate section 4.2. Unlike with respect to my ruling on the complaints' claim based on the $30 million payment under the Backstop Agreement, therefore, I am not prepared to rule, as the defendants request, that their right to retain such fees is under no scenario a right implicated by their exercise of a remedy relating to the Common Collateral and, therefore, under no circumstances, a breach of ICA section 4.2.

On the other hand, the complaints' failure to specify the grounds on which the defendants have retained their ongoing professional fee reimbursements requires the dismissal of the claim under *Twombly, Iqbal* and *L–7 Designs*. The defendants and the Court are forced to guess the basis for the claim (or, more aptly, whether any facts show that the defendants received their professional fee reimbursements in the exercise of their remedies with respect

to the Common Collateral). Therefore, I will dismiss the claim under ICA section 4.2 for the defendants' retention of payment of professional fees on that basis.

 The common stock in the newly reorganized debtor that the defendants are to receive under the chapter 11 plan is concededly not Common Collateral. Neither the first, 1.5, nor second lien holders have a lien on that stock. (Nor do they have a lien on the parent corporation's current stock.) Accordingly, the plaintiffs cannot argue that section 4.2 has been breached by the defendants' retention of stock distributed to them under the plan on the basis that it is Common Collateral.

The plaintiffs argue, however, that the new stock distributed under the plan constitutes "proceeds" of the Common Collateral as used in the phrase "any Common Collateral or proceeds thereof received by any Second–Priority Secured Party" in ICA section 4.2. They rely on the definition of "proceeds" in section 9–102(a)(64) of the New York U.C.C., which was enacted in 2001 to expand on, and resolve ambiguities in, the definition of "proceeds" in former U.C.C. section 9–306. Official Comment to U.C.C. section 9–102(a), par. 13.

U.C.C. section 9–102(a)(64) includes the following property as "proceeds": "(A) [w]hatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected on, or distributed on account of, collateral; (C) rights arising out of collateral; (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral."

The plaintiffs contend that the defendants are being distributed new stock under the plan "on account of" the Common Collateral (or at least on account of a portion of the collateral, as it is acknowledged that a significant amount, in fact the majority, of the second lien holders' claims are unsecured, deficiency claims), or that the distribution of the stock is in respect of "rights arising out of" Common Collateral, and, therefore, that such stock constitutes proceeds of the Common Collateral for purposes of U.C.C. section 9–102(a)(64).

As a matter of law, however, I conclude that the new stock to be distributed to the defendants under the plan is not proceeds of the Common Collateral for purposes of New York U.C.C. section 9–102(a)(64), or, for that matter, any other definition of collateral proceeds. From the perspective of the debtors, that stock is not something that any currently secured party's existing lien would attach to even under the expansive definition of "proceeds" in section 9–102(a)(64), because the new common stock comprises proceeds of the *defendants'* liens and claims, not the proceeds of the *debtors'* assets that constitute the Common Collateral. It is being received therefore on account of or based on rights arising out of the defendants' liens and claims, not on account of the Common Collateral or based on rights arising out of the Common Collateral. A party with a lien on the *defendants'* rights against the debtors could assert that lien against the new common stock to be issued under the plan as the proceeds of its collateral; a creditor, such as the plaintiffs, with a lien on the *debtors'* assets could not, however, assert a lien against that stock because the debtors' assets—the Common Collateral—have not been disbursed or distributed with, or otherwise affected by, the disbursement of the new stock. The Common Collateral remains, instead, unaffected. The defen-

dants' lien will change (it, along with the defendants' unsecured claims, will be released under the plan in exchange for the new common stock); however, the property constituting the Common Collateral will not change. Therefore, the new stock is not proceeds of the Common Collateral.

The point can be made from the plaintiffs' perspective, too. Under the confirmed chapter 11 plan, the first and 1.5 lien holders continue to retain their liens on *all* of the Common Collateral. That collateral will not have been diminished one iota by the distribution of new stock under the plan to the defendants. Indeed, the distribution of that stock and the related discharge of debt owed to the second lien holders improves the rights of the first and 1.5 lien holders in the Common Collateral because the plaintiffs will no longer have to worry about any second lien holder exercising any rights in respect of such collateral. But, more importantly, the property constituting the Common Collateral has stayed the same. There has been no economic event altering the nature of those assets that gives rise to proceeds. Instead, the defendants now have a right to receive new stock in the reorganized enterprise in return for the discharge of their prior liens and claims; the debtors have not received such stock in lieu of any Common Collateral, which fully remains, again, subject to the plaintiffs' liens.

As stated in Official Comment 13 to New York U.C.C. section 9–102(a)(64), the amended definition of "proceeds" was intended to address cases that had too narrowly read the prior definition in U.C.C. section 9–306. As discussed in a seminal article that influenced, as well as was influenced by, the effort to amend the U.C.C.'s definition of "proceeds," R. Wilson Freyermuth, "Rethinking Proceeds: The History, Misinterpretation and Revision of U.C.C. Section 9–306," 69 Tul. L.Rev. 645 (1995),

"proceeds" of collateral should include in an economic sense whatever results from the transformation of collateral; or, as Freyermuth states, "In an economic sense, the term 'proceeds' properly includes whatever assets the debtor receives by virtue of an event that exhausts or consumes some of the collateral's economic value or productive capacity." *Id.* at 667.

That would include, as specifically addressed by subsection (E) of the definition in U.C.C. section 9–102(a)(64), insurance, which some cases had excluded from the prior definition; or, in subsection (D), rights based on nonconformity, interference with the use of, or defects, or infringement of rights in, or damage to, collateral; or, in fact, anything that reflects a change in the collateral, as the collateral proceeded from one form of economic value to another. Underlying this common-sense approach is the notion that the secured creditor bargained for a lien on a piece of property. If that property is altered, the secured creditor is entitled to it in its altered form, as collateral proceeds if the parties' intended the lien to extend to proceeds. Thus, if collateral is damaged, the secured creditor's lien should extend to its proceeds in the form of insurance, and if the value of collateral in the form of intellectual property is reduced by infringement, the secured creditor's lien should extend to the debtor's infringement claim, as proceeds.

Thus, for example, the definition enacted in U.C.C. section 9–102(a)(64) would override *Hastie v. FDIC*, 2 F.3d 1042 (10th Cir.1993), which held that stock dividends would not constitute proceeds of a lien on stock although the value of the stock was clearly reduced by the dividend. See Official Comment 13(a) to N.Y. U.C.C. section 9–102(a)(64).

Here, the Common Collateral has not changed in any way as a result of the

issuance and distribution of the new stock. Therefore, to argue that the new stock received by the defendants constitutes the proceeds of the first and 1.5 lien holders' collateral would unfairly add to such collateral, the value of which obviously dilutes the value of the new stock, whereas the issuance of the new stock does not dilute the value of the Common Collateral. *See Beal Bank, S.S.B. v. Waters Edge Ltd. P'ship,* 248 B.R. 668, 679–90 (D.Mass.2000) (transfer of equity in the debtor is not a sale of property subject to a lien on debtor's assets).

To hold otherwise, as pointed out by the defendants' reply brief, also would contradict the case law addressing whether a secured creditor receives the "indubitable equivalent" of its secured claim under section 1129(b)(2)(A)(iii) of the Bankruptcy Code if it receives stock in the reorganized enterprise as part of cramdown treatment under a chapter 11 plan. *See, e.g., In re San Felipe @ Voss, Ltd.,* 115 B.R. 526, 531 (S.D.Tex.1990); 7 *Collier on Bankruptcy,* par. 1129.04[2][c] (16th ed. 2014) at 1129–129. Obviously, if the stock were collateral proceeds to which the creditor's lien would attach, it would not be *substitute* collateral appropriate for analysis under the "indubitable equivalent" cramdown alternative[1] in section 1129(b)(2)(2)(A)(iii). Very clearly, however, a secured creditor is not getting the proceeds of its collateral when it gets stock in the reorganized entity, unless, of course, that stock was paid by a third-party buyer in return for the debtor's assets comprising the collateral. See 124 Cong. Rec., H11,104 (Daily Ed. Sept. 28, 1978).

I therefore will dismiss the complaints' claim premised on the alleged breach of section 4.2 of the Intercreditor Agreement arising from the defendants' receipt and retention of new common stock as their distribution under the chapter 11 plan, be-

cause such stock is neither Common Collateral nor the proceeds of Common Collateral. Given that conclusion, I do not need to consider the defendants' other arguments in support of their request to dismiss this claim.

The complaints also assert a breach of the implied covenant in every New York contract of good faith and fair dealing. The parties agree, though, that this claim survives only if there is a relevant ambiguity in the Intercreditor Agreement that might give rise to such a duty or if the ICA imposes a duty on the defendants although not necessarily expressly states such a duty, for example, a duty not to violate the spirit of the ICA or not to thwart its operation.

To the extent that I have interpreted the plain meaning of the Intercreditor Agreement to preclude the plaintiffs' claims, therefore, I also dismiss their claims for breach of the duty of good faith and fair dealing. That would apply to my rulings on the alleged breaches of ICA section 4.2 based on the defendants' receipt and retention of new common stock under the plan and the $30 million backstop charge, as well as my ruling on the alleged breach of ICA section 3.1(c) based on the defendants' objection to the plaintiffs' make-whole and related claims and their support of confirmation of the chapter 11 plan.

Otherwise the plaintiffs' breach of good faith and fair dealing claims would survive to the extent that I found any ambiguity in the ICA or a violation of the spirit of the ICA. However, because I have dismissed the complaints' remaining claims because they were stated in no more than a conclusory fashion, I also will dismiss the related breach of good faith and fair dealing claims. I will, however, give the plaintiffs thirty days to move under Fed. R. Bankr.P. 7015 to amend their complaints

in respect of the claims that I have dismissed solely on the basis of *Twombly, Iqbal* and *L–7 Designs.* Such motion should attach the proposed amended complaint as an exhibit. The remaining good faith and fair dealing claims will be evaluated if the plaintiffs' file such Rule 15 motions.

Again, however, I will not permit a motion to amend those claims where I found another basis for dismissal, which are dismissed with prejudice. Counsel for the defendants should submit a proposed order consistent with this ruling, having first circulated it to counsel for the plaintiffs.[1]

---

1. The motions also assert that the Court does not have in personam jurisdiction over some or all of the defendants. Because the defendants have not provided factual support for that assertion, however, this ruling is without prejudice to any party's arguments regarding in personam jurisdiction.